UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| DEBRA D. KELLY, ) | |
| ) | |
| Plaintiff, ) | CASE NO. 1:13CV1274 |
| ) | |
| v. ) | |
| ) | MAGISTRATE JUDGE GEORGE J. |
| CAROLYN W. COLVIN[1], ) | LIMBERT |
| ACTING COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | MEMORANDUM OPINION AND ORDER |
| ) | |
| Defendant. ) | |

Debra D. Kelly ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her applications for Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the Commissioner's decision is affirmed and Plaintiff's complaint is dismissed with prejudice:

## I. **PROCEDURAL AND FACTUAL HISTORY**

On December 8, 2008, Plaintiff applied for SSI, alleging disability beginning August 30, 2008. ECF Dkt. #11 ("Tr.") at 135, 251. The SSA denied Plaintiff's application initially and on reconsideration. Tr. at 135-136. Plaintiff requested an administrative hearing, which was held on April 6, 2011. Tr. at 74-100. At the hearing, the ALJ accepted the testimony of Plaintiff, who was represented by counsel, and Nancy Borgeson, a vocational expert ("VE"). On May 17, 2011, the ALJ issued a Decision denying benefits. On June 29, 2012, the Appeals Council vacated the Decision and remanded the matter for further proceedings.

On August 5, 2011, Plaintiff filed an additional SSI application, alleging disability beginning on March 1, 2009. The pending applications were consolidated. A second hearing was held on December 18, 2012. Tr. at 36-73. At the hearing, the ALJ accepted the testimony of Plaintiff, who was represented by counsel, Gene Burkhammer, a second VE, and Dr. Daniel E. Schweid, M.D., an

---

[1] On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

impartial medical expert ("ME"). On January 22, 2013, the ALJ issued a Decision denying benefits. Tr. at 10-35.  The ALJ gave *res judicata* effect to a previous SSA decision, dated October 1, 2008, and, as a consequence, concluded that Plaintiff was not disabled as of October 2, 2008.[2] Plaintiff filed a request for review, which the Appeals Council denied on April 10, 2013. Tr. at 1.

On June 8, 2013, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On September 9, 2013, Plaintiff filed a brief on the merits.  ECF Dkt. #14. On October 28, 2013, with leave of Court,  Defendant filed a brief on the merits.  ECF Dkt. #16.  A reply brief was filed on November 6, 2013. ECF Dkt. #17.

## II.    **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff, who was forty-nine years of age on the original alleged onset date, as well as the date ultimately relied upon by the ALJ, and fifty-three years of age at the second hearing, suffered from depression, anxiety, sprain and minor degenerative changes at the acromioclavicular joint of both shoulders (present in the right shoulder only since August 2, 2009), menorrhagia and iron deficiency anemia, status post endometrial ablation, hysteroscopy, dilation and curettage, all performed on September 15, 2011, and status post laparoscopic total hysterectomy, bilateral salpingectomy, and cystoscopy, all performed on March 23, 2012, which qualified as severe impairments under 20 C.F.R. § 416.920(c). Tr. at 16.

The ALJ concluded that Plaintiff also suffered from the following non-severe impairments: bipolar disorder, osteoarthritis of the right knee joint, right plantar fasciitis, osteoarthritis of the first metatarsophalangeal joint, degenerative disc disease and osteoarthritis in the lumbar spine.  Tr. at 17.  Although the ALJ included bipolar disorder in the list of non-severe impairments, he observed that there was insufficient evidence of manic behavior to conclude that Plaintiff suffered from the disorder. Next, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§416.920(d), 416.925 and 416.926 ("Listings").  Tr. at 15-16.

---

[2]On April 6, 2011, Plaintiff amended her alleged onset date to July 28, 2009 in writing. Tr. at 208.  At the first hearing, which was held on the same date, Plaintiff amended her alleged onset date to December 8, 2008. The second ALJ appears to have been unaware of the amended onset dates.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined by 20 C.F.R. 416.967(b) but with the following limitations: She can only occasionally bend, stoop, crouch, and squat; She cannot kneel or crawl; She can only climb steps and ramps occasionally and with the aid of a railing; She cannot climb ladders, ropes, or scaffolds; She can only occasionally reach overhead with both upper extremities; She is limited to routine, low-stress work; She cannot perform work involving high or strict production quotas; She cannot perform assembly line work or piece rate work; She cannot perform work involving negotiation, arbitration, confrontation, or other intense interpersonal interactions with the public, coworkers, or supervisors. Tr. at 21.

The ALJ ultimately concluded that, although Plaintiff could not perform her past work as a store cashier, she is able to perform the representative occupations of housekeeping cleaner, mail clerk, and laundry folder. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

### III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## V.    ANALYSIS

Plaintiff advances two arguments in this appeal. First, Plaintiff contends that the ALJ violated the treating physician rule when he did not give controlling weight to the opinions of Dr.

Louise A. Sieben and Dr. Michael Tran. Second, Plaintiff contends that the ALJ erred when he concluded that Plaintiff's bipolar disorder, osteoarthritis of the right knee joint, degenerative disc disease and osteoarthritis in the lumbar spine were severe impairments.

### **A.    Medical evidence**

From early February of 2008 to the present, Plaintiff's medical records have repeatedly noted diagnoses of generalized anxiety disorder ("GAD"). Tr. at 381-382, 372-373, 366-367, 364-365, 416-420, 422-424, 538-539, 511-513, 602, 599-501, 981-1000. During an office visit on January 12, 2009, Louise A. Sieben, M.D., Plaintiff's primary care physician at Metrohealth, Plaintiff reported that she was experiencing anhedonia, psychomotor agitation, and fatigue. Tr. at 364. She also described feelings of hopelessness, difficulty concentrating, impaired memory, despair, excessive guilt, depressed mood, and being worried and anxious. Dr. Sieben observed that Plaintiff's affect was flat and congruent and her base emotion was sadness. Tr. at 364. Dr. Sieben's physical examination revealed that Plaintiff's right knee showed limited range of motion in flexion due to pain, and there was muscular tenderness to palpation on her back. Tr. at 364. On May 22, 2009, Dr. Sieben noted the existence of iron deficiency anemia, which was confirmed by labs taken that same day that reflected a low iron level of 12 ug/dL. Tr. at 421-424, 473.

Michael Tran, M.D., Plaintiff's treating psychiatrist met with Plaintiff on July 17, 2009. Tr. at 411. Plaintiff reported that she has always had problems controlling her anger, experiences mood swings, resorts to throwing objects when she is upset, has periods of highs and lows, has depressive episodes, and also suffers from anxiety and panic attacks. Tr. at 411. Dr. Tran diagnosed Plaintiff with a mood disorder not otherwise specified and prescribed Seroquel XR. Tr. at 412.

On July 28, 2009, Plaintiff met with Dr. Sieben and complained of right upper arm pain which caused pain when she raised her arm above her head or lifted heavy objects. Tr. at 538. Subsequent to a physical exam, Dr. Sieben diagnosed Plaintiff with rotator cuff disease NEC. Tr. 538-539. Dr. Tran's Progress Notes from August 1, 2009, reflected that Plaintiff was bipolar, which according to Dr. Tran, was evidenced by a history of both manic and depressive episodes. Tr. at 535.

Dr. Sieben ordered an x-ray of Plaintiff's right knee on September 21, 2009. Tr. 471-472. The results from the x-ray revealed minimal degenerative changes of the medial compartment of the

knee and the posterior aspect of the patella. Tr. at 471. Mary Ellen Behmer, M.D., a board certified internist at Metrohealth's West Park Medical Center, noted that Plaintiff complained of back issues during an office visit on October 21, 2009, and diagnosed Plaintiff with lower back pain. Tr. at 524-525.

Wilfredo M. Paras, M.D. an internist, examined Plaintiff on November 16, 2009, for the State agency. Tr. 477-479. Dr. Paras noted chronic anemia; possible plantar fasciitis of the right foot; and arthritis involving the right knee, lower back and right shoulder. Tr. at 477. X-rays performed during the office visit revealed degenerative changes of the acromioclavicular joint of the right shoulder and degenerative changes of the first metatarsal phalangeal joint of the right foot. Tr. at 480, 481. Dr. Paras opined that, based on Plaintiff's limitations resulting from pain in her right knee and right shoulder, with stiffness of the left knee and lower back, coupled with her current bipolar disorder and problem with sleepiness, Plaintiff's general work limitation was sedentary work. Tr. at 479.

Dr. Tran completed an undated Mental Medical Source Statement, which appears to have been completed in December of 2009. Tr. at 571-572. Dr. Tran opined that Plaintiff could not travel in unfamiliar places or use public transportation; would have noticeable difficulty doing things relating to memory including understanding and remembering very short simple instructions and maintaining attention and concentration for extended periods of time. She would have noticeable difficulty more than twenty percent of the workday and workweek in performing activities within a schedule, maintaining regular attendance, and/or being punctual within customary tolerances; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. at 571-572. Dr. Tran commented that Plaintiff showed signs of bipolar disorder, mood swings, obsessive compulsive disorder, and aggressive tendencies towards
authority and coworkers . Tr. at 572.

On New Year's Eve of 2009, Plaintiff fell down a flight of stairs. Tr. at 511. She saw Thomas D. Ginley, D.O., on January 4, 2010, and reported injuries to her left hip, left lower extremity, and bilateral lumbar sacral spine area. Tr. at 511-512. Upon a musculoskeletal exam, Dr. Ginley found tenderness to palpation over the paraspinal muscles in the painful area, paraspinal muscle spasm, and the straight leg raise test was positive on the left at forty-five degrees. Tr. at 511.

On February 1, 2010, Plaintiff complained of lower back pain and bilateral shoulder pain related to the fall on New Year's Eve to Dr. Behmer. Tr. at 508. Plaintiff was unable to raise her left arm above shoulder height and stated that she had tried non-steroidal anti-inflammatory drugs with little relief . Tr. at 508. Dr. Behmer's physical exam revealed that Plaintiff's left shoulder had poor range of motion ("ROM") in all directions; that even passive ROM was very painful; her pain was diffuse over the proximal humerus; the right shoulder had normal ROM, but there was tenderness over the acromioclavicular joint to the proximal humerus; and there was painful and reduced lumbosacral ROM noted. Tr. at 508. Dr. Behmer diagnosed Plaintiff with lower back pain and pain in the joint, shoulder region. Tr. at 509. Dr. Behmer noted her concern about the rotator cuff injury on the left with a frozen shoulder and stated that she would request an orthopaedic evaluation, opining that Plaintiff would need physical therapy at a minimum. Tr. at 509.

Dr. Behmer ordered x-rays of Plaintiff's lumbar spine and shoulders to be taken on February 8, 2010. Tr. 500-503. The lumbar spine x-ray showed mild lumbar levoscoliosis with some minimal disc space narrowing at L4-5 and L5-S1. Tr. at 500. X-rays of the right and left shoulders showed some minor degenerative changes in the acromioclavicular joints. Tr. at 501-502. On March 11, 2010, Plaintiff had a follow up visit with Dr. Behmer. Tr. at 559. Plaintiff was still suffering from pain in her joint, shoulder region and low back pain. Tr. at 559. Dr. Behmer noted that the shoulder had very limited ROM and Plaintiff was starting to get frozen shoulder. Tr. at 559. Plaintiff was urged to follow through with physical therapy and to comply with all previous recommendations. Tr. at 559-560. Dr. Behmer referred Plaintiff to Amar B. Mutnal, M.D., in MetroHealth's Orthopaedics Department.

Plaintiff met with Dr. Mutnal on April 19, 2010. Tr. at 556. After a thorough physical examination, Dr. Mutnal diagnosed Plaintiff with rotator cuff disease. Tr. at 557. Plaintiff saw Dr.

Behmer on May 25, 2010, and complained of abdominal pain that had started months ago, as well as irregular and frequent menstrual cycles. Tr. at 551. Dr. Behmer's diagnoses included metrorrhagia, an abnormal pap smear of the cervix, and endometrial stripe increased. Tr. at 552-553.

Plaintiff attended a physical therapy session with Theresa O'Neil, P.T. on June 11, 2010. Tr. at 546. Ms. O'Neil's notes establish that Plaintiff related having pain since she fell down the steps, causing her to fall back onto her extended lower upper extremities on New Year's Eve of 2009. Tr. at 546. Plaintiff stated that the pain was improving but that it did occasionally wake her up at night. Tr. at 546. She described the pain as throbbing and rated her average pain as eight on a scale of one to ten. Tr. at 546-547. Ms. O'Neil noted that Plaintiff presented with pain, decreased ROM, decreased strength, decreased flexibility, decreased function, decreased knowledge of HEP, postural deviation and lack of home exercise program. Tr. at 548.

Ms. O'Neil's notes further indicate that as a result of her physical problems, Plaintiff had increased pain when reaching forward and overhead, pulling, lifting, driving, doing her hair, and washing her back. Tr. at 549. Ms. O'Neil's diagnoses was rotator cuff disease, and she stated that Plaintiff would benefit from physical therapy for ROM, strengthening, flexibility, functional training, manual therapy, modalities, home exercises, patient education, pain control, and postural re-education. Tr. at 549-550. The prognosis for therapy was "fair," and Ms. O'Neil's plan incorporated physical therapy sessions with Plaintiff one to two times per week for a minimum of six visits, and up to ten visits. Tr. at 549.

On June 21, 2010, Dr. Behmer diagnosed Plaintiff with dysuria, urinary frequency, endometrial stripe increased, and abdominal pain. Tr. 544-545. Dr. Behmer's assessment indicated that Plaintiff was negative for infection and strongly urged that Plaintiff see a gynecologist since her symptoms might be related. Tr. at 543-544.

Plaintiff attended another physical therapy session with Ms. O'Neil on June 29, 2010. Tr. at 540. Plaintiff rated her pain as six on a scale of one to ten. Tr. at 540. She reported that she had missed the previous session due to not feeling well and was sick again that day but did not want to miss another appointment. Tr. at 540. Due to Plaintiff's complaints of being ill, Ms. O'Neil deferred

the therapy exercises, instead placing Plaintiff on a transcutaneous electrical nerve stimulation unit for thirty minutes and applying a moist heat pack for fifteen minutes. Tr. at 541-542. Ms. O'Neil noted in her assessment notes that Plaintiff reported a decrease in symptoms following the session. Tr. at 541. Ms. O'Neil's diagnoses and physical therapy plan for Plaintiff remained unchanged. Tr. at 541.

Plaintiff was admitted into the emergency room at Fairview Hospital on December 4, 2010, following an altercation with her husband. Tr. at 646-656. Plaintiff hit her husband with a baseball bat when he came toward her. Tr. at 652. Her husband then grabbed her by the neck and threw her to the ground. Tr. at 652. When he released his grip on Plaintiff and turned away, she crawled over to a gun, grabbed it, and shot her husband in the leg. Tr. at 652. Plaintiff complained of a slight neck sprain caused by her husband's attempt to choke her and lower back/pelvis pain on her right side from being thrown to the ground. Tr. at 647-653. The final diagnoses were cervical strain and lumbar strain. Tr. at 647. Plaintiff was treated and discharged the same day. Tr. at 646-656.

Plaintiff was admitted into the ER again on December 14, 2010, after her daughter called emergency services because she had difficulty arousing Plaintiff. Tr. at 629-630. Plaintiff stated that she was having trouble sleeping and took extra Klonopin to help her sleep and to make her "stop thinking." Tr. at 630, 635. Plaintiff attributed her difficulty sleeping to the fact that she was going through a divorce and had been under a lot of stress, but she denied any suicidal or homicidal ideation. Tr. at 630. The ER notes indicated that Plaintiff's affect/mood was not normal and that her disposition was "poor." Tr. at 631. Plaintiff was diagnosed with nontoxic ingestion and left the hospital the same day against medical advice. Tr. at 631, 638.

Plaintiff was admitted into the ER on February 5, 2011, presenting with a cough and pain and cramping in her lower abdomen. Tr. at 610-611. The nurse's notes indicate that Plaintiff left the hospital after stating that she felt fine after taking Motrin and would return to the hospital if the pain came back. Tr. at 611.

Dr. Behmer completed a Mental Medical Source Statement on March 29, 2011. Tr. at 605-606. Dr. Behmer is an internist not a psychiatrist, however, she opined that Plaintiff was unable to maintain attention and concentration for extended periods of time. Tr. at 605. Dr. Behmer

-9-

indicated that Plaintiff was able to perform the following designated tasks or functions, but had or would have noticeable difficulty more than twenty percent of the workday or workweek: understanding and remembering detailed instructions; completing a normal workday and workweek without interruptions from psychological based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; and traveling in unfamiliar places or using public transportation. Tr. at 605-606. Dr. Behmer indicated that Plaintiff would be able to perform the following designated tasks or functions, but had or would have noticeable difficulty from eleven to twenty percent of the workday or workweek: carrying out detailed instructions; working in coordination with or proximity to others without being distracted by them; and setting realistic goals or making plans independently of others. Tr. at 605.

Dr. Behmer also completed an Upper Extremity Medical Source Statement on March 29, 2011. Tr. at 608-609. Dr. Behmer identified Plaintiff's signs and symptoms as bilateral shoulder pain and dropping things easily/often, further noting that Plaintiff's fingers "freeze up" when doing repetitive motion. Tr. at 608. Dr. Behmer noted that Plaintiff's impairments affect her ability to lift and opined that Plaintiff could only lift or carry less than 10 pounds occasionally (from very little to one-third of an eight-hour workday). Tr. at 608. Dr. Behmer also indicated that Plaintiff had limitations with reaching and stated that she had decreased ROM. Tr. at 609. In response to the inquiry regarding the percentage of time during an eight-hour workday that Plaintiff could use her hands/fingers/arms for particular activities, Dr. Behmer noted the following: Plaintiff could only use her right or left hand to grasp, turn and/or twist objects ten percent of the time; use her right or left fingers for fine manipulations twenty percent of the time; use her right or left arm to reach in front of her body fifty percent of the time; and use her right or left arm to reach overhead ten percent of the time. Tr. at 609. On June 3, 2011, Plaintiff scheduled an urgent visit with Dr. Behmer. Tr. at 941-945. Dr. Behmer diagnosed Plaintiff with adjustment disorder with anxious mood, offered her support, instructed her to take her medications as directed, and referred her to psychiatry. Tr. at 943.

Plaintiff's June 14, 2011 labs showed significant anemia from the baseline, reflecting a hemoglobin level of 5.3. Tr. at 934-937, 879, 885. Kenneth E Edelman, M.D. directed a nurse to call

Plaintiff with the results and instruct her to go to the Emergency Department ("ED") for evaluation. Tr. at 934, 879.

Plaintiff was admitted into the ED, presenting for menorrhagia and acute blood loss anemia Tr. at 879. An exam revealed a slightly enlarged uterus, and minimal vaginal oozing, which Plaintiff stated had improved after using Motrin. Tr. at 880. The ED physician recommended three units of packed red blood cells, a Lupron shot, a pelvic ultrasound for possible fibroids, and a follow up with her gynecologist as an outpatient. Tr. at 880.

On July 19, 2011, Plaintiff went to a follow up appointment with Dr. Edelman. Tr. 874-877. Although Plaintiff reported feeling better, she continued to bleed. Tr. at 874. Dr. Edelman diagnosed Plaintiff with leiomyoma of the uterus and ordered a consult with Robert R. Pollard, M.D.. Tr. at 875.

At the visit with Dr. Pollard on July 28, 2011, an endometrial biopsy was performed. Tr. at 868. Dr. Pollard's noted in his assessment that Plaintiff suffered from a fibroid uterus with menorrhagia and significant anemia. Tr. at 868. Dr. Pollard discussed possible options with Plaintiff, including hormonal, depoprovera, Lupron, surgery, hysterectomy and ablation; however, Plaintiff expressed her desire to refrain from undergoing any invasive procedures and to try depoprovera, while continuing with her iron supplements. Tr. at 868.

On September 15, 2011, Plaintiff had an endometrial ablation, hysteroscopy, dilation and curettage performed. Tr. at 696-700. The findings of this procedure were indicative of a large amount of blood clots within the cavity of the uterus. Tr. at 697.

On November 5, 2011, Plaintiff was admitted into the ER for a right upper arm injury resulting from a fall. Tr. at 758. Radiographs of Plaintiff's right humerus were unremarkable, and the attending physician's impression of x-rays of the right shoulder reflected a normal exam. Tr. at 766-767. Plaintiff's medical records indicate that she was still experiencing pain in her right shoulder from this fall into late January of 2012. Tr. at 1023-1024.

On March 8, 2012, Plaintiff was admitted into the ER. Tr. at 1067. Test results revealed that her hemoglobin level was 9.4 and an abnormal electrocardiogram resulting from left ventricular

-11-

hypertrophy. Tr. at 1063, 1066. Plaintiff was diagnosed with near syncope and anxiety, among other things. Tr. at 1069-1071.

Dr. Behmer completed a discharge application for a federal education loan program on September 17, 2012. Tr. at 1045-1046. In the application, Dr. Behmer indicated that Plaintiff had a medically determinable physical or mental impairment that prevented her from engaging in any substantial gainful activity, in any field of work, and could be expected to result in death, or had lasted for a continuous period of not less than sixty months, or could be expected to last for a continuous period of not less than sixty months. Tr. at 1046. Dr. Behmer stated that Plaintiff's disabling conditions were severe and included degenerative joint disease of the lumbar spine, generalized anxiety disorder, bipolar disorder, and rotator cuff disease. Tr. at 1046.

On October 15, 2012, Plaintiff was seen by Julia E. Bruner, M.D. for constant knee pain. Tr. at 1047. Plaintiff stated that the pain was strongest when walking and was relieved with rest. Tr. at 1047. An exam of Plaintiff's knees revealed that she was positive for crepitus and had anterior right knee swelling, but there was no erythema or warmth. Plaintiff's gait was normal. Tr. at 1048. The physician noted under his assessment notes that Plaintiff suffered from chronic osteoarthrosis of the knee, and she was diagnosed with primary localized osteoarthrosis in the lower leg. Tr. at 1048-1049.

### B.     State Agency Assessment

On March 18, 2009, David Dietz, Ph.D., reviewed the record and completed a psychiatric review technique form. Tr. 384-394. Dr. Dietz diagnosed depression, anxiety, personality disorder, and borderline I.Q., and opined that Plaintiff's mental impairments caused mild restriction in her activities of daily living; moderate difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation. Tr. at 394.

On March 24, 2009, Walter Holbrook, M.D., completed a physical residual functional capacity assessment. Tr. at 402-409. Dr. Holbrook opined that Plaintiff could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand or walk six hours in an eight-hour workday, and sit for six hours in an eight-hour workday. Dr. Holbrook further opined that Plaintiff was limited in her ability to reach in all directions, including overhead. Tr. at 405.

Both Drs. Dietz and Holbrook adopted the previous functional capacity assessments completed in 2008 from Plaintiff's previous SSI application.

### C.     Hearing testimony

Plaintiff testified that the pain in her knees makes it difficult to stand sometimes and also to sit. Tr. at 39-40. Plaintiff further testified that, within one year, she had fallen down the stairs at least three times because her knee would just give out. Tr. at 41. According to her testimony, Plaintiff can carry up to five pounds and must use two hands to lift a two-liter bottle. Tr. at 40. She can walk for ten to fifteen minutes and she can sit for fifteen to twenty minutes. Tr. at 40. However, Plaintiff cannot stoop, crouch, squat, kneel, or crawl. Tr. at 41.

Plaintiff lives with her daughter. Tr. at 42. She does not vacuum or wash clothes, but she can make small meals. Tr. at 43. Plaintiff testified that she suffers from an anxiety disorder and panics "at the slightest thing." Tr. at 43. Plaintiff further testified that she also suffers from high blood pressure, which exacerbates her anxiety. Tr. at 43. Plaintiff's mind wanders. Tr. at 42. When asked about how she got along with other people, Plaintiff stated that she has trouble getting along with others and that most people say she is mean. Tr. at 39-41.

The ME testified that the following impairments met Social Security's definition of the term severe impairment: mild osteoarthritis of the right knee, on and off right plantar fasciitis, metatarsal phalangeal joint arthritis in the right hallux, mild osteoarthritic changes in the acromioclavicular joints of both shoulders, rotator cuff problems, relatively mild degenerative disc disease and degenerative arthritic changes in the lumbar spine, menometrorrhagia, chronic iron deficiency anemia, depression, and anxiety. Tr. at 47-51. Although the ME testified that there did not seem to be enough evidence in the record to show that Plaintiff had bipolar disorder, he later testified ". . . but it doesn't matter in my estimation here whether it's a bipolar disorder or whether it's just depression, combination of depression and anxiety. The impairment is the same, or I would say the, the restriction is the same." Tr. at 50, 53.

### D.     The ALJ's Decision

The ALJ credited the opinions of Drs. Tran and Behmer regarding Plaintiff's mental limitations to the extent that they opined that Plaintiff would have noticeable difficulty in many

-13-

work-related categories, but he disagreed that her "noticeable difficulty" necessarily "would amount to her being 'distracted from job activity' to the point that she would be 'off-task.'" Tr. at 24. Furthermore, to the extent that the physicians intended to state that Plaintiff would be off-task for twenty percent of the workday, the ALJ concluded that those opinions were not supported by the physicians' treatment notes. The ALJ relied upon the objective mental status examinations in the record, as well as the sole Global Assessment of Functioning score in the record, dated June 24, 2009, which revealed only mild psychological symptoms.

With respect to Plaintiff's physical limitations, the ALJ rejected Dr. Behmer's conclusions regarding Plaintiff's alleged inability to work based upon Dr. Behmer's treatment notes, which established that Plaintiff had only minimal arthritic changes in her right knee.

Finally, the ALJ rejected the opinion of Dr. Paras, the one time consulting physician, who concluded that Plaintiff was limited to sedentary work. The ALJ observed that Dr. Paras' conclusion was contradicted by his own examination notes, which established that Plaintiff walked normally without an assistive device, and there was no evidence of joint abnormalities. The ALJ credited Dr. Paras' opinion as it related to Plaintiff's pain in her right knee and back, and her limited range of motion in her upper extremities, and included limitations relating to these problems in the RFC.

### E.     Step Two Analysis

Plaintiff's arguments shall be addressed out of order for clarity of analysis. At step two, a claimant must show that he or she suffers from a severe medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not considered severe when it "does not significantly limit [one's] physical or mental ability to do basic work activities." §404.1521(a). The Regulations define basic work activities as being the " 'abilities and aptitudes necessary to do most jobs,' and include: (1) physical functions; (2) the capacity to see, hear and speak; (3) '[u]nderstanding, carrying out, and remembering simple instructions;' (4) '[u]se of judgment;' (5) '[r]esponding appropriately to supervision, co-workers, and usual work situations;' and (6) '[d]ealing with change in a routine work setting.'" *Simpson v. Comm'r Soc. Sec.*, 344 Fed. Appx. 181, 190 (6th Cir. Aug.27, 2009) (quoting 20 C.F.R. §§ 404.1521(a)-(b) and 416.921(a)-(b)).

At step two, the term "significantly" is liberally construed in favor of the claimant. The regulations provide that if the claimant's degree of limitation is none or mild, the Commissioner will generally conclude the impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. §404.1520a(d). The purpose of the second step of the sequential analysis is to enable the Commissioner to screen out "totally groundless claims." *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir.1985). The Sixth Circuit has construed the step two severity regulation as a "*de minimis* hurdle" in the disability determination process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988). Under a Social Security policy ruling, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ is required to treat it as "severe." SSR 96-3p (July 2, 1996).

Once the ALJ determines that a claimant suffers a severe impairment at step two, the analysis proceeds to step three; any failure to identify other impairments, or combinations of impairments, as severe in step two is harmless error. *Maziars v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987). However, all of a claimant's impairments, severe and not severe, must be considered at every subsequent step of the sequential evaluation process. See C.F.R. §404.1529(d); C.F.R. §§ 416.920(d). Here, the ALJ considered Plaintiff's physical and mental impairments at the third and fourth steps of the analysis. Consequently, the ALJ's determination that those limitations were not severe impairments do not constitute error at step two.

### F. Treating Physician Rule

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is

"well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson v. Commisioner of Social Security,* 378 F.3d 541, 544 (6th Cir.2004) quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Commisioner of Social Security,* 486 F.3d 234, 243 (6th Cir.2007), citing *Wilson*, 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. *Id.* citing 20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* citing §404.1527(c)(6).

In *Gayheart*, the Sixth Circuit recognized that conflicting substantial evidence must consist of "more than the medical opinions of the nontreating and nonexamining doctors."  The Sixth Circuit reasoned that "[o]therwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion." *Gayheart* at 377. However, "[t]he determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985).

Here, the ALJ included numerous limitations in the RFC relating to Plaintiff's severe and non-severe physical and mental impairments, despite unremarkable findings in the record. Objective tests revealed minimal degenerative changes in Plaintiff's right knee, Tr. at 471, mild lumbar levoscoliosis with some minimal disc space narrowing, Tr. at 500, and minor degenerative changes in Plaintiff's shoulders Tr. at 501-502. The reports of the state agency physician and consultative examiner revealed similar findings.  Dr. Paras observed that, except for slight crepitus in her right knee, Plaintiff's gait, posture, and joints appeared normal. Tr. at 478.

Despite Plaintiff's mild impairments, the ALJ included several limitations in the RFC relating to Plaintiff's physical limitations.  The ALJ limited Plaintiff to only occasional bending, stooping, crouching and squatting, climbing steps and ramps only with the aid of a railing.  Further, the RFC foreclosed jobs that involved any kneeling, crawling, and climbing of ladders, ropes, and scaffolds. Finally, in recognition of Plaintiff's shoulder problems, the ALJ limited the RFC to work that only requires occasional reaching overhead with both upper extremities.  Tr. at 21.

Turning to Plaintiff's mental problems, Dr. Tran consistently observed that Plaintiff was adequately groomed, oriented, and cooperative; and she exhibited spontaneous and normal speech, full concentration, fair judgment and insight, and a logical, organized thought process. Tr. at 411, 445, 448, 527. He acknowledged that Plaintiff did not exhibit evidence of paranoia, delusions, or homicidal or suicidal ideation Tr. at 411, 445, 448, 527. In fact, Plaintiff often reported that she was doing well. Tr. at 444, 526. The opinions of the treating physicians regarding Plaintiff's mental limitations were also at odds with other evidence of record. Dr. Paras observed that Plaintiff was able to understand and concentrate fairly well during the examination, and she had no problem

hearing or speaking. Tr. at 478. Dr. Paras further observed that Plaintiff was alert, oriented, coherent, pleasant, and cooperative. Tr. at 478. State agency physician Dr. Dietz opined that Plaintiff's mental impairments caused only mild restriction in her activities of daily living; moderate difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation. Tr. at 394.

In recognition of the foregoing impairments, the ALJ limited Plaintiff to routine, low-stress work without high or strict production quotas, and no assembly line work or piece rate work, or work involving negotiation, arbitration, confrontation, or other intense interpersonal interactions with the public, coworkers, or supervisors. Tr. at 21.

Simply stated, the dire conclusions articulated by the treating physicians are not supported by their own treatment notes, or other medical evidence of record. Accordingly, the ALJ did not err in declining to give controlling or even great weight to the treating physicians' opinions regarding Plaintiff's ability to perform full-time work.

## VI.     CONCLUSION

For the foregoing reasons, the Commissioner's decision is AFFIRMED and Plaintiff's complaint is DISMISSED with prejudice.

DATE: September 25, 2014

                                           */s/George J. Limbert*
                                           GEORGE J. LIMBERT
                                           UNITED STATES MAGISTRATE JUDGE